UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Docket No. 1:04-CR-10194-RCL

UNITED STATES of AMERICA,

v.

FRANCIS MUOLO, Anthony
Bucci and David Jordan,
       Defendants.

MEMORANDUM OF LAW IN SUPPORT
OF MOTION TO SUPPRESS EVIDENCE

Preliminary

This motion presents a Fifth Amendment challenge to the Government's use of question-first/Miranda-later tactics. The motion seeks suppression of both pre- and post-*Miranda* warning statements. This exclusionary remedy is available under Supreme Court's most recent law on *Miranda*-type Fifth Amendment violations. *Missouri v. Seibert*, 124 S. Ct. 2601, 2608 (2004).

FACTS

Francis Muolo is a 44 year-old Stoneham native with no criminal record. He is alleged to be the driver of the Government's informant/principal witness, Jon Minotti, a disgraced MCI Concord corrections officer with a history of drug trafficking and personal drug abuse. Mr. Muolo's co-defendants are Malden Police Detective David Jordan and Anthony Bucci. The Government charges conspiracy to possess with intent to distribute more than 500 grams of cocaine powder (three kilograms) and the brandishing of a firearm (Jordan's service

1

pistol) in connection with a December 24, 2003 robbery of Mexican drug trafficker (Ruiz) under DEA surveillance. Discovery indicates that Jon Minotti (the Government's chief witness) was the instigator and organizer of the alleged narcotics robbery. Muolo is acknowledged to have been removed and out of view from the scene of the alleged crime.

The Defense seeks suppression of two sets of statements, one on the 18th and the other on the 20th of May, 2004. The first statements on the 18th and 20th are unwarned. The later statement on the 20th is warned but tainted by the earlier statements. Both the warned and unwarned statements should be suppressed as the latter is the product of the illegality of the former. The May 18th interrogation involves an unwarned custodial statement where as many as eight agents took Mr. Muolo to a secluded location and grilled him. See May 6, 2005 Muolo Affidavit. Agents found Mr. Muolo on the street doing yard work. He drove with three other agents in a sport-utility vehicle with three more cars following behind. The caravan arrived at a location behind the Stoneham Hockey rink and the agents as a group (believed as many as eight) interrogated Mr. Muolo.

For the May 20 interrogations, Mr. Muolo was informed that a complaint and warrant application were being filed. The Task Force Agents told him they were allowing him to get an attorney and that his questioning could wait until an attorney was available. Mr. Muolo agreed to go and was transported to headquarters and interrogated again about his May 18 statements. Agents were

confrontational about inconsistencies in his statements and expressed that they were angry and frustrated with him. He was then given Miranda warnings by a friendly officer. Mr. Muolo was interrogated again after a waiver and made statements to the agents.

ARGUMENT

A.   Summary

> "The object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Missouri v. Seibert*, 124 S. Ct. 2601, 2608 (2004).

This Court should suppress the products of prohibited question-first methods employed by the DEA/MSP task force against Mr. Muolo. The May 18, 2005 statement and the first May 20 statement should be suppressed as the product of custodial interrogation without *Miranda* warnings. The subsequent May 20, 2005 statement should be suppressed as the product of the earlier statements.

By first obtaining a statement to Mr. Muolo's involvement and then interrogating him on two subsequent occasions, law enforcement essentially undermined the meaningful use of Miranda warnings.

> Miranda addressed "interrogation practices ... likely ... to disable [an individual] from making a free and rational choice" about speaking, 384 U. S., at 464-465, and held that a suspect must be "adequately and effectively" advised of the choice the Constitution guarantees, id., at 467. The object of question-first is to render Miranda warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed. *Missouri v. Seibert*, 124 S. Ct. 2601, 2608 (2004).

B.   Contours of the Law

The foundation for challenges to police conduct under *Miranda* is, of course, the Fifth Amendment.  "In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment ... commanding that no person `shall be compelled in any criminal case to be a witness against himself.' " *Bram v. United States*, 168 U. S. 532, 542 (1897).

In order for appellant to make out a claim under *Miranda*, however, his statements must have been the product of custodial interrogation.  *Miranda v. Arizona*, 384 U. S. 436, 444 ("[T]he prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.").

"Miranda warnings must be given before a suspect is subjected to custodial interrogation."  *United States v. Ventura*, 85 F.3d 708, 710 (1 Cir. 1996). The custody determination is the initial and central inquiry as it is "`the touchstone to the need for *Miranda* warnings.'" Id., quoting U*nited States v. Quinn,* 815 F.2d 153, 160 (1 Cir. 1987). The "ultimate inquiry," however, is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  In assessing whether there was a "restraint on freedom of movement," "a court must examine all the circumstances surrounding the interrogation."

4

*Ventura*, 85 F.3d at 711. This is an objective test: "the only relevant inquiry is `how a reasonable man in the suspect's shoes would have understood his situation.' The subjective beliefs held by the interrogating officer or the person being interrogated are not germane." Id., quoting *Stansbury v. California*, 511 U.S. 318, 324 (1994).

The protections of *Miranda* extend beyond actual questioning by the police to include the "functional equivalent" of interrogation, meaning "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

The proposition that subsequent *Miranda*'ed statements may be suppressed as tainted by the illegality of earlier unwarned statements has been the subject of evolving law. In, *Siebert, supra*, the Supreme Court recently upheld exclusion of pre- and post-Miranda confessions as the product of a method established to circumvent *Miranda*. Only four years earlier, the High Court in *Dickerson* had affirmed *Miranda* as substantive Fifth Amendment law and struck the 1968 Congressional anti-*Miranda* statute of 18 USC §350. *Dickerson v. United States*, 530 U. S. 428, 444 (2000). While the status of Miranda as substantive Fifth Amendment law was open to question before *Dickerson, supra*, it was an area of debate whether an exclusionary remedy could apply to evidence derived from (i.e., tainted by) a *Miranda* violation. The Court's rulings in cases like *Elstad*

5

indicated that such a remedy might not be available so long as *Miranda* was viewed as a procedural and not a substantive holding. *Oregon v. Elstad*, 470 U. S. 298 (1985)(holding subsequent Miranda warning sufficient to remove taint of earlier unwarned confession, reaffirmed and modified in *Dickerson* and *Siebert*, supra).

C. Use of Prohibited Interrogation Methods in this Case

Mr. Muolo's case presents the kind of interrogation prohibited by the Supreme Court's recent pronouncement in *Siebert*. *Missouri v. Seibert*, 124 S. Ct. 2601, 2608 (2004), discussed, *infra*. What happened to Mr. Muolo to make the DEA/MSP Task Force's interrogation methods illegal? Several agents surprised Mr. Muolo, picked him up and took him for a ride. (May 6, 2005 Affidavit of Francis Muolo, ¶¶ 1 & 2.) Somewhere on the way, the reason for the trip changed and Muolo figured out he was the subject of the agents' investigation. (Muolo Affidavit, ¶ 2; "Do you know what we're here for?" I answered that I thought it was about certain information I knew concerning terrorists. I went up to them and they said "it will only be a few minutes".) They got him to a secluded spot, surrounded him and worked a statement out of him. (Muolo Affidavit, ¶¶ 2 & 3; [t]hey pulled in the back of the rink. On the way I noticed the other cars were following us… there were as many as eight agents surrounding me. I had my back against the wall of the hockey rink…The tone changed suddenly and I was intimidated.") The agents let him go and came back two days later to tell him that they were getting a warrant for his arrest and that he could come along - and bring a lawyer if he liked. The

6

agents brought Mr. Muolo to the Boston DEA office and conducted a confrontational interrogation in which they told Mr. Muolo he knew he was a liar.  (Muolo Affidavit, ¶5; Agent Tully and Trooper O'Neil were angry at me and yelled that I had spoken to my son about the questioning and that the school would know.  They then started calling me a liar and challenged me about my statements of May 18.  I still had had no *Miranda* warnings.)  The agents left Muolo in huff, letting him know he was in big trouble for not coming clean.  Then a friendly agent approached, just trying to find out why the other agents were so angry.  He got Mr. Muolo to sign a *Miranda* waiver first.  (Muolo Affidavit, ¶5; "The agents left and then I sat down with Trooper Cepero and signed a *Miranda* form.  It was then that Trooper Cepero offered to wait for further interrogation until I got a lawyer.  Trooper Cepero said, however, he assured me that he knew I had a "minor role" in the situation.  I was then asked to explain my earlier statements.  I was arrested after making a statement.")

*Miranda's* rationale protects against interrogation methods designed to frustrate Fifth Amendment rights, just like the ones used on Mr. Muolo.  That rationale is as applicable to police interrogation now as it was over a generation ago.  The concerns are the same: to address "interrogation practices ... likely ... to disable [an individual] from making a free and rational choice" about speaking; a suspect must be "adequately and effectively" advised of the choice the Constitution guarantees.  *Miranda v. Arizona*, 384 U. S. 436, 464-465 & 467 (1966).

Although there has been much law on *Miranda*, little has changed: *Missouri v. Siebert*'s reasoning in 2004 is that interrogation tactics like the ones

7

used in this case can make *Miranda* warnings irrelevant and even misleading. In other words, once police have obtained a statement (twice in this case), the suspect is unlikely to exercise his rights. The suspect, having given his statement, will waive his Fifth Amendment rights and repeat the statement he has given earlier. In fact, a recitation of rights is likely to have a reverse effect - i.e., to intimidate the suspect - once he hears his statements will be used against him. As Justice Souter explains:

> Just as "no talismanic incantation [is] required to satisfy [Miranda's] strictures," *California v. Prysock*, 453 U. S. 355, 359 (1981) (per curiam), it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance. "The inquiry is simply whether the warnings reasonably `conve[y] to [a suspect] his rights as required by *Miranda*." *Duckworth v. Eagan*, 492 U. S. 195, 203 (1989) (quoting *Prysock*, supra, at 361). **The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as** *Miranda* **requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with** *Miranda***, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.** By any objective measure, applied to circumstances exemplified here, it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content. After all, t**he reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the**

> warnings, the interrogator can count on getting its duplicate, with trifling additional trouble. Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. **What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail**. Thus, **when Miranda warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."** *Moran v. Burbine*, 475 U. S. 412, 424 (1986)**.** By the same token, it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle.

*Missouri v. Seibert*, 124 S. Ct. 2601, 2608 (2004).

D. Custodial Interrogation

There can be little serious argument that the circumstances under which Mr. Muolo was interrogated were not custodial. During the May 18 interrogation, as many as eight agents took Mr. Muolo the back of a hockey rink and surrounded him. In the second instance, Mr. Muolo was informed that an arrest warrant was being sought (it had probably already been obtained) and he was taken to a closed interior room of a Boston DEA office. Even if Mr. Muolo was technically "free to leave" on any of these occasions, the circumstances let him know that the agents had near total control over him and that he was

restrained. The totality of the circumstances included overwhelming agent numbers, control of the surroundings, knowledge of a pending arrest warrant and hostile emotional confrontation.

The Miranda custody test is an objective test. Two discrete inquiries are essential: (1) the circumstances surrounding the interrogation, and (2) given those circumstances, whether a reasonable person would have felt free to terminate the interrogation and leave. "Once the ... players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Thompson v. Keohane*, 516 U. S. 99, 112. See, *Yarborough v. Alvarado*, 541 U.S. 652 (2004)(for a discussion and application of the factors).

CONCLUSION

For the reasons set forth above, Mr. Muolo's motion should be granted.

Dated this 7th day of May, 2005 at Boston, Massachusetts.

/s./ *Kevin L. Barron*
Kevin Lawrence Barron BBO550712
Attorney for FRANCIS MUOLO
453 Washington Street - 5th Fl.
Boston MA 02111-1325
Tel. No. 617-407-6837
Cellular 617-407-6837
Telecopier 617-517-7711
k@lawyerbarron.com

ELECTRONIC FILING