# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 04-10194-RCL** |
| | ) | |
| **ANTHONY BUCCI,** | ) | |
| **DAVID JORDAN** | ) | |
| **FRANCIS MUOLO** | ) | |
| **Defendants.** | ) | |

### Government's Opposition to Defendant Muolo's
### Motion to Suppress Statements

The United States of America, by and through Assistant United States Attorney John T. McNeil, respectfully submits this opposition to Defendant Muolo's motion to suppress statements he made to law enforcement officers on May 18, 2004, and May 20, 2004. (Doc.No. 133, 134).

In sum, the Court should reject Muolo's motion with respect to the statements he made to officers on May 18, 2004, because those statements were made in the context of a non-custodial discussion between the defendant and officers who were seeking his cooperation in an ongoing investigation. Moreover, the defendant's statements to officers during that discussion were made voluntarily, and there was no unlawful coercion employed by the officers.

The statements Muolo made to officers on May 20, 2004, were made only after he was provided Miranda warnings, signed a written Miranda waiver, and after officers repeatedly encouraged him to wait until he obtained an attorney before making statements. It was only after Muolo repeatedly pressed his cooperation on the officers that they took a statement from him.

**Relevant Facts[1]**

In mid-December 2003, law enforcement officers from the United States Drug Enforcement Administration (DEA), in conjunction with state and local law enforcement officers, were investigating the narcotics dealing activities of a number of individuals including a man named Carlos Ruiz.   Between December 20, 2003 and December 24, 2003, law enforcement officers learned that Ruiz planned to sell three kilograms of cocaine through Jon Minotti to Muolo's co-defendant Anthony Bucci.   The transaction was scheduled to take place in the late morning of December 24, 2003, in a parking lot at the Malden Medical Center in Malden, Massachusetts.

While it was unknown to Ruiz and to the law enforcement officers monitoring Ruiz's activities, Muolo, Bucci, Minotti and Malden Police Detective David Jordan were conspiring to rob Ruiz of the three kilograms of cocaine when Ruiz arrived at the Malden Medical Center parking lot.[2]  After putting the finishing touches on their plan on the morning of December 24, 2003, the four co-conspirators took up their assigned positions.   Minotti returned home to await Ruiz's arrival.   Muolo, who had been assigned the role of getaway driver, took up position in a car near the Malden Medical Center parking lot.   Bucci parked his car in the medical center lot in the location where the heist was to take place.   Jordan set up at an unknown location, ready to be

---

[1]  This section outlines a preliminary statement of the evidence that the government anticipates that it will present at a hearing on Defendant Muolo's motion to suppress.  The government also relies on the more detailed recitation of facts it set forth in Government's Opposition to Bucci's Motion to Suppress (Doc.No. 152), and incorporates that statement by reference.   If the evidence elicited at the hearing on the motion differs in any material way from this preliminary statement, the government intends to rely on the evidence so elicited.

[2]     The wholesale value of the cocaine was approximately $80,000.

called in by the other co-conspirators.

As planned, Ruiz, under the surveillance of law enforcement officers, met with Minotti at Minotti's home.  The two men drove the Malden Medical Center parking lot and parked next to Bucci's black Mercedes Benz.  Bucci came out of the medical center to meet them.  While Ruiz, Minotti and Bucci were standing next to Bucci's Mercedes Benz, Jordan pulled into the lot and rammed the back of Ruiz's car.  Jordan came out of his car and held his handgun on Ruiz and Bucci, identifying himself as a police officer.  As planned, Minotti took the cocaine that Ruiz was to sell to Bucci and ran through the woods.  He met Muolo on the other side of the woods and the two men drove from the location to Muolo's house.

Between December 24, 2003, and May 20, 2004 – the date on which officers arrested Bucci, Jordan, Muolo and Minotti – law enforcement officers conducted an investigation of the drug transaction they observed in the Malden Medical Center parking lot.  While officers knew that Minotti, Bucci and Ruiz were involved in the transaction from their observations in the parking lot and their interception of Ruiz's mobile telephone communications, they did not know of Muolo's involvement until sometime later.

On February 21, 2004, Muolo approached Massachusetts State Trooper Marion Fletcher and told her that he had information regarding the narcotics activities of Minotti and Bucci.[3]  He told her that Bucci provided Minotti with quantities of cocaine and that Minotti was awaiting a large shipment of marijuana.  Muolo also told her that Bucci receives assistance from local law enforcement officers and that he could possibly introduce an undercover officer to Minotti.

---

[3] Fletcher lived near Muolo and the two were acquainted.  Muolo approached Trooper Fletcher at her home.

Trooper Fletcher in turn passed the information on to State Troopers working with the DEA on the instant investigation.

On May 18, 2004, near the conclusion of the investigation, officers decided to approach Muolo to obtain his cooperation in making one or more recorded conversations which incriminated his co-conspirators.  Officers had an indication that Muolo would cooperate because Muolo had voluntarily approached Trooper Fletcher in February, and because Muolo was the son of a well-liked State Trooper who was still in active duty.

In the evening of  May 18, 2004, three law enforcement officers (two DEA agents and one ATF agent) who were traveling together in street clothes and in an unmarked vehicle pulled up to the front of Muolo's home while Muolo was outside.  From inside the car, officers greeted him, identified themselves as law enforcement officers, exchanged pleasantries and asked Muolo if he would speak with them.  Muolo readily agreed.  Officers asked Muolo to join them in the car so that they could go someplace more private to speak.[4]  Muolo agreed to accompany them.

The officers drove with Muolo to an ice skating rink parking lot which was approximately two miles from Muolo's home.  On the drive to the parking lot, which lasted approximately five minutes, agents told Muolo that they were aware of his role in the conspiracy to rob Ruiz of cocaine and requested that he assist in their efforts to investigate the other members of the conspiracy.  Officers also told Muolo on more than one occasion that he was not under arrest and that he did not have to talk with them.  While Muolo initially denied involvement in the conspiracy, he agreed to remain with officers and to listen to their proposal

---

[4]     Officers did not want to speak with Muolo in front of his home because they were concerned that Minotti might see them in conversation.  Minotti lived only a short distance away from Muolo and was friends with him.

regarding his cooperation.  Throughout the discussions between officers and Muolo their aim

was to encourage him to cooperate against Minotti, Bucci and Jordan, rather than to obtain a

statement or confession.

After they arrived at the skating rink parking lot, the three officers and Muolo stood

around the rear of the police vehicle.  One or more officers sat on the tailgate of the vehicle

while Muolo stood with them.  The conversation lasted approximately 20-30 minutes.  During

this time at least one other officer met them at this location.

During the course of the conversation, officers outlined that they knew he was the driver

for the theft of cocaine from Ruiz, and that they wanted him to cooperate by setting up a meeting

with Minotti and recording that meeting.  Muolo admitted to officers that he gave Minotti a ride

from the Malden Medical Center area.  However, he minimized both his role in the conspiracy

and his knowledge of the objectives.  Among other things, Muolo claimed that he thought

Minotti and Bucci were doing a marijuana deal, not that they were involved in the theft of

cocaine.  He also said that when he picked up Minotti after Minotti came running out of the

woods, Minotti was not carrying anything with him.

Officers told Muolo that he would likely be facing a substantial jail sentence on the theft

of the cocaine and that he could help himself by being the first one to cooperate.  Officers also

told him that he would embarrass his father and his family by his involvement in this drug theft,

and that he could alleviate that embarrassment by cooperating with officers.[5]  While Muolo did

---

[5]  At no time during the interview did officers intend to intimidate Muolo, nor did they threaten him with physical harm.  Since they were seeking his cooperation, and he was the son of a State Trooper, the officers sought to enlist his cooperation through persuasion rather than by threats.  In addition, contrary to Muolo's affidavit, there is no evidence that eight officers backed him up against a building to obtain a confession.

not give a complete statement of his involvement in the crime that evening, he did agree to cooperate by attempting to set up a meeting with Minotti.

Before making contact with Minotti, Muolo requested that officers take him to his house so he could get his truck.  Officers did so, dropping him off at his home as requested.  Officers then went to eat dinner.  They arranged to meet Muolo approximately 30-60 minutes later in another nearby location behind a public works facility.

Muolo, driving his own vehicle, met with officers at the appointed location and time. Once there, he placed a number of calls to Minotti, but was unable to reach him.  Muolo stayed with officers for approximately 60-90 minutes.  During this meeting, a number of other officers appeared in preparation for placing a wire on Muolo and monitoring the proposed meeting with Minotti.  It was readily apparent to Muolo that he could terminate his cooperation and leave at any point in time; he had his vehicle with him to do so.

When Muolo was unable to reach Minotti, he and officers agreed to break it off for the night, and to meet again in the morning.  Officers told Muolo not to tip-off Minotti or otherwise talk to him when they were not present.  Muolo agreed and drove from the location in his own vehicle.

The following day, May 19, 2004, officers met with Muolo at his work site.  Muolo placed a call to Minotti.  When Muolo reached Minotti on his mobile telephone, Muolo knocked the recording device he had been provided by agents from his lap and onto the floor of the car. While Muolo believed that he had effectively prevented officers from hearing Minotti's side of the conversation by disabling the recording device, Muolo did not know that officers had authority to intercept Minotti's calls and were recording the call from a remote location.

6

During the call between Muolo and Minotti, officers learned from listening to Minotti's end of the call that Muolo had spoken to Minotti earlier that morning or the night before and had warned Minotti that he had been contacted by law enforcement officers. Muolo had also told Minotti not to pick up his telephone if Muolo called him. After Muolo terminated the call, officers confronted Muolo with this information. Muolo, not knowing that officers had heard Minotti's side of the telephone call, denied tipping-off Minotti. Officers then told him they were no longer interested in his cooperation and left him at his job site.[6]

On May 20, 2004, the day that officers intended to arrest all of the individuals involved in the conspiracy, two Massachusetts State Troopers working with DEA on the joint investigation spoke with Muolo's father, who was also a State Police Trooper. They apprised him of his son's involvement in the conspiracy to rob Ruiz of the cocaine, their failed attempts to cooperate him, and their intention to arrest Muolo on federal charges that day. Muolo's father volunteered to arrange a meeting between his son and the officers so that Muolo could be taken into custody without incident.

At approximately 2 p.m. two State Troopers working on the DEA investigation met Muolo and his father at Muolo's home in Stoneham. Muolo asked to cooperate with officers in the investigation and agreed to accompany the officers to Boston. Officers told Muolo that he was not under arrest and he did not need to say anything to them. They also told him to await the outcome of Muolo's father's efforts to locate an attorney for him. While officers were at his

---

[6] The officers immediately approached Minotti to cooperate in the investigation. Minotti confessed to his involvement in the crime and agreed to set up a meeting with Jordan which he was to record. On the evening of May 19, 2004, Minotti recorded a conversation with Jordan in which Jordan made a number of incriminating statements.

home and on the way to Boston, Muolo repeatedly pressed them to permit him to cooperate, and to listen to his statement about his role in the crime, and the roles of the co-conspirators. Because officers knew that his father was planning on seeking representation for Muolo, they told him repeatedly to wait until they reached Boston.

Once in Boston, Muolo again pressed officers to permit him to cooperate. Officers again indicated that he may wish to have an attorney present and encouraged him to wait for a call from his father. When Muolo continued to press them, officers read him his <u>Miranda</u> rights, and had him sign a <u>Miranda</u> waiver form.[7] He was then interviewed by two officers (DEA Agent Tully and State Trooper O'Neal). During the course of that interview, he admitted his involvement in the conspiracy and told them he knew it was a plan to steal cocaine from a drug dealer. However, Muolo again made a number of statements which were not consistent with facts which the officers already knew. Frustrated by Muolo's continued attempts to minimize his role in the crime and his insistence on failing to tell the complete truth, Tully and O'Neal told Muolo that they believed he was continuing to lie to them. They then told him to write out a statement regarding his involvement and to sign it. Tully and O'Neal then left the room.

One of the State Troopers who transported Muolo from his home returned to the room. Muolo told him what he had said to Tully and O'Neal, and expressed concern that those officers did not believe him. Before making the written statement, the Trooper suggested that Muolo contact his father, and permitted Muolo to call his father. After the call, Muolo decided that he desired to retain an attorney, and the interview was terminated without Muolo completing a written statement.

---

[7]    The executed waiver form is attached as Exhibit 1.

**Argument**

I.    **Muolo's statements to officers on May 18, 2004, were neither the product of a custodial interrogation nor any police coercion, and should not be suppressed.**

This Court should deny Muolo's motion with respect to the May 18 meeting because his statements were not the product of a custodial interrogation and were not the product of "police coercion," as that term has come to be narrowly defined by Colorado v. Connelly, 479 U.S. 157 (1986) and its progeny.

A.    **Muolo was not in custody at the time officers sought his cooperation, so officers had no obligation to provide Miranda warnings.**

At the time Muolo spoke to officers on May 18, 2004, he was neither placed under arrest by officers nor did officers restrain his freedom of movement in any significant way. Since officers' discussion with Muolo was not "custodial," they were under no obligation to provide Miranda warnings to him, and there is no basis for the suppression of his statements to officers for their failure to give him such warnings.

In United States v. Landry, 345 F.Supp.2d 118 (D. Mass. 2004), this Court recently outlined the contours for determining whether an interrogation is custodial for purposes of Miranda warnings:

> The Miranda warnings are required once a person is subjected to custodial interrogation. Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); United States v. Quinn, 815 F.2d 153, 160 (1st Cir.1987). In assessing whether the defendant was in custody, a court must first "determine what were the circumstances surrounding the exchange between the government agent[s] and the suspect. This inquiry is distinctly factual." United States v. Trueber, 238 F.3d 79, 93 (1st Cir.2001). Next, given those circumstances, a court must determine "whether and when a reasonable person in [the defendant's] position would have believed that he was actually in police custody and being constrained to a degree associated with formal arrest." Id. (quoting United States v. Streifel, 781 F.2d 953, 962 (1st Cir.1986)); United States v. Nishnianidze, 342 F.3d 6, 13 (1st Cir.2003); see Commonwealth v. Larkin, 429 Mass. 426, 432, 708

> N.E.2d 674 (1999) (explaining that the test of custody is objective: "whether a reasonable person in the suspect's shoes would experience the environment in which the interrogation took place as coercive").
>
> In making its custody determination, a court should consider "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Nishnianidze, 342 F.3d at 13 (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir.1987)).

Landry, 345 F.Supp.2d at 120-121 (string cite omitted). In making its assessment of custody in

Landry this court relied in part on the tests outlined by the Eighth Circuit in United States v.

Axsom, 289 F.3d 496 (8th Cir. 2002):

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntary acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning." Axsom, 289 F.3d at 500 (quoting United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir.1990)).

Id.

Taking each of the Axsom tests in turn, first, in this case, officers interviewed Muolo

only after telling him he was not under arrest and that he did not have to speak with them.

Implicit in these statements was that Muolo was free to leave at any point, and that they would

take him back to his home where they first met him. See, e.g. United States v. Ortega-Santana,

869 F.2d 12, 14 (1st Cir., 1989)(no seizure of defendant's person when told he was at liberty to

leave at any time). In fact, when Muolo requested officers to take him from the ice rink to his

home to pick up his truck, officers complied.

Second, officers placed no substantial restraint on Muolo's freedom of movement.  In the brief automobile ride, no physical restraints, such as handcuffs, were placed on Muolo, nor was his door locked preventing him from leaving the car.   Muolo was seated in the vehicle like any other passenger and in the same manner that officers were seated in the vehicle.  He was not placed behind any protective barrier, such as that in a squad car.  Moreover, in the public parking area at the ice rink, Muolo had freedom to move about the parking lot as he spoke with officers, and could have simply walked away from them.  The lot was adjacent to a busy public road which was readily accessible.  Officers did not surround Muolo or place their hands on him in any manner which restrained him, "to a degree associated with formal arrest."  Landry, 345 F.Supp.2d at 120-121.

Third, Muolo made the initial contact with law enforcement officers in February 2004 when he provided information about Bucci and Minotti and volunteered to cooperate against them.  Officers approached Muolo on May 18 in part on his earlier offer to cooperate.  When officers approached Muolo that day they did so in a familiar public place  – in front of his home – and asked if he would speak with them; Muolo acquiesced.  When officers asked him to join them in the car, Muolo acquiesced a second time.  No deceit or trickery was employed to obtain Muolo's agreement to speak with them or to join them in the vehicle.

Fourth, no "strong arm tactics" were employed during the course of Muolo's interaction with officers.  Officers made no threats of physical violence or serious retaliation if Muolo chose not to cooperate with them.  Officers met with Muolo at the ice rink for a brief period of time – only 20-30 minutes. See, e.g. United States v. Nishnianidze, 342 F.3d 6, 14 (1st Cir. 2003)(length of interview a factor and a forty-five minute interview "not exceptionally long"); United States

v. Fernandez-Ventura, 132 F.3d 844, 848 (1st Cir. 1998)(interview lasting approximately 90 minutes "not extraordinary").  During this period, Muolo never expressed a desire to terminate the discussion.  While officers confronted him with their knowledge of his involvement in the crime and the fact that he faced conviction and incarceration for his involvement, the recitation of such information is both common and permissible in law enforcement investigations.  See, e.g. Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir., 2001)(Police officers' statement to defendant that he "was facing either the death penalty or life in prison and that it would be in his 'best interest' to tell the truth" was not unconstitutionally coercive).

Fifth, while there were as many as five officers present during the discussion in the parking lot behind the ice skating rink, the atmosphere was not "police dominated."  The discussion took place in a public place in the open, and officers did not arrange themselves so as to threaten or otherwise dominate Muolo to a degree associated with formal arrest.

Sixth, Muolo was not placed under arrest at the conclusion of the questioning.  To the contrary, he was told he was not going to be arrested and he was not.  Instead, when he asked to return home to get his truck, officers acquiesced, and Muolo voluntarily met with them again that evening after he had time to get his vehicle and to reflect on whether he should cooperate.  Moreover, he went home in his own vehicle later that evening and voluntarily met with officers the next day to feign his continued cooperation.  Thus, employing the tests set out in Landry and Axsom, Muolo was never in custody for purposes of Miranda warnings on the evening of May 18, 2004.


**B.     There is no evidence of police coercion which would justify the suppression of Muolo's statements.**

12

The defendant has argued only that his Fifth Amendment rights were violated by officers' failure to provide him Miranda warnings on May 18, 2004.  Because officers' interview of Muolo was not custodial, the Court's inquiry into his statements on May 18 may end there. While defendant does not specifically rely on the due process clause of the Fifth Amendment, a review of the facts and relevant law also reveals that Muolo's statements on that day were voluntary, and that officers' conduct did not constitute a due process violation.

The due process clause of the Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law."   It protects against compelled confessions by means of a voluntariness test.  Dickerson v. United States, 530 U.S. 428, 432-33 (2000); Miller v. Fenton, 474 U.S. 104, 109 (1985) (certain interrogation techniques are so offensive to a civilized system of justice that they must be condemned).  "[C]ases refined the [voluntariness] test into an inquiry that examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." Dickerson v. United States, 530 U.S. at 432-33, quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  "The due process voluntariness test takes into consideration 'the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation.'" Id.; see also United States v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990) ("The voluntariness of an admission depends on 'whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances.'"); United States v. Byram, 145 F.3d 405, 407-408 (1st Cir. 1998)("the Supreme Court has confined the voluntariness concept by holding that only confessions procured by coercive official tactics should be excluded as involuntary.")  The government bears the burden

13

of establishing the voluntariness of a confession by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489 (1972); Jackson, 918 F.2d at 241.

As made clear in the Supreme Court's decision in Colorado v. Connelly, the due process voluntariness inquiry does not focus on the defendant's mental condition, but rather, it focuses on the governmental activity giving rise to the confession, and in particular, on whether there was any coercive police conduct.   As stated by the Court: "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Connelly, 479 U.S. at 164.

The defendant makes no factual claim that his will was somehow overborne by officers' conduct, and that his statements were involuntary.  While he makes the general assertion that officers used "prohibited interrogation methods," Defendant's Memorandum of Law at 6, he cites no cases which hold that any specific conduct which occurred on May 18 falls within Connelly's definition of "coercive police conduct."  As argued above, the neutral and public location of the interaction between officers and Muolo did not give rise to a coercive situation. See, e.g. United States v. Burns, 15 F.3d 211, 216 (1st Cir. 1994)(defendant agreed to location of interview and it was conducted in a setting with which she was familiar).  Moreover, it was Muolo who made an initial inquiry about cooperating with law enforcement officials against Bucci and Minotti. See, e.g. United States v. Conley, 156 F.3d 78, 83-84 (1st Cir. 1998)(confession voluntary because defendant initiated contact with officers).  In addition, officers' statements that they knew Muolo was involved in the crime and that he faced significant time in prison is not inherently coercive conduct.   See, e.g. Simmons, 235 F.3d at 1133 ("[a] truthful and noncoercive statement of the possible penalties which an accused faces

14

may be given to the accused without overbearing one's free will," quoting <u>United States v. Ballard</u>, 586 F.2d 1060, 1063 (5th Cir.1978)).  In addition, officers' statements regarding the benefits which Muolo might receive in his case if he was the first to cooperate are also not inherently coercive. <u>See</u>, <u>e.g.</u>  <u>United States v. Ruggles</u>, 70 F.3d 262, 265 (2nd Cir. 1995)(confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials)(citing cases); <u>United States v. Okafor</u>, 285 F.3d 842, 847 (9th Cir. 2002) (customs agent's statements to defendant that cooperation could help him avoid a lengthy prison sentence did not overbear defendant's will and were not coercive)(citing cases).  No threats of violence or serious retaliation were made against Muolo if he did not speak, and his interaction to police where he made incriminating statements was not prolonged. <u>Byram</u>, 145 F.3d at 408 (finding voluntariness in part on lack of threats or serious retaliation if defendant refused to speak and on the shortness of interview).  Muolo never requested that their discussion be terminated.  <u>See</u>, <u>e.g.</u> <u>Cristobal</u>, 293 F.3d at 141 (finding defendant's failure to request that the interview to stop as indicia of voluntariness); <u>United States v. Guay</u>, 108 F.3d 545, 550 (4th Cir. 1997)(holding confession voluntary even though defendant was in pain, in part because defendant never requested interview to stop).

Finally, Muolo's own conduct reflects that his statements were voluntary.  Not only did he agree to discuss his cooperation with officers, but he met with officers on two subsequent occasions: later that evening and then again the next day.  Moreover, Muolo's attempts to minimize his involvement in the crime and to shift the blame onto Minotti, Bucci and the police officer involved with them, reflects that Muolo was clear-headed and his statements were voluntary. <u>See</u> <u>e.g.</u> <u>Pagan v. Keane</u>, 984 F.2d 61, 63 (2nd Cir. 1993) ("attempt[s] to shift blame

15

for the shooting to an accomplice, suggests that petitioner was well aware of the nature of the police questioning").

Muolo primarily relies on the Supreme Court's recent decision in Missouri v. Seibert, 124 S.Ct. 2601 (2004) in arguing that his statements on May 18 and May 20 should be suppressed. His reliance on this case in misplaced. First, in Seibert, the Court concluded that the interrogation of the defendant was custodial and that Miranda applied. Seibert, 124 S.Ct. at 2606. The Court also concluded that officers made a "conscious decision" not to provide Miranda warnings at the outset of the interview so as to obtain the most comprehensive statement from the defendant before she exercised any of her rights. Id. Once officers took a comprehensive statement from the defendant, which they knew would be inadmissable, they provided warnings and had the defendant repeat the statements she had already made. Id. The Supreme Court concluded that this carefully considered police practice was an intentional circumvention of the defendant's rights and the protections afforded by Miranda warnings, and concluded that her statements should be suppressed. Id. at 2610-13.

As argued above, on May 18, 2004, officers did not engage in a custodial interrogation that triggered Miranda warnings. Secondly there is no evidence that officers intentionally omitted giving Miranda warnings so as to obtain a confession; in this case officers were seeking cooperation, not a confession. Third, two days passed between Muolo's first set of admissions and his second set of statements on May 20. Most importantly, there is no evidence that officers in this case engaged in the type of planned circumvention of Muolo's rights which so troubled the Supreme Court in Seibert. Rather, the first interview with Muolo was non-custodial attempt to obtain his cooperation. Two days later, when he was arrested, as outlined below, officers

16

were extraordinarily solicitous of Muolo's constitutional rights, and only took his statement after Muolo pressed it upon them.

II.     **Muolo's statements to officers on May 20, 2004, were made after Muolo was provided written <u>Miranda</u> warnings, and after Muolo was encouraged by officers to await the retention of an attorney; the statements should not be suppressed because they were freely and voluntarily given.**

Muolo's statements to officers on May 20, 2004, were made only after he was warned to wait for an attorney and also provided written <u>Miranda</u> warnings. Because warnings were provided, and there is no evidence of coercive police conduct, this Court should deny Muolo's motion to suppress his statements.

A.     **Muolo was provided <u>Miranda</u> warnings and voluntarily waived those rights.**

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Court concluded that in the context of 'custodial interrogation' certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against self-incrimination. More specifically, "the Court held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination.'" <u>Rhode Island v. Innis</u>, 446 U.S. 291, 297 (1980), quoting <u>Miranda</u>, 384 U.S. at 444. A suspect like Muolo who has been advised of his rights can "waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." <u>Miranda</u>, 384 U.S. at 444; <u>Connelly</u>, 479 U.S. at 169 ("Of course, a waiver must at a minimum be "voluntary' to be effective against an accused."); <u>United States v. Palmer</u>, 203 F.3d 55, 60 (1st Cir. 2000).

Following a recitation of <u>Miranda</u> rights, an express statement that a suspect is willing to make a statement, followed closely by a statement can constitute a waiver. <u>North Carolina v.</u>

17

Butler, 441 U.S. 369, 373 (1979). "An express written or oral statement or waiver by a defendant of his right to remain silent or of the right to legal assistance of counsel, though not conclusive, is 'usually strong proof of validity of that waiver.'" United States v. Hack, 782 F.2d 862, 866 (10th Cir. 1986), quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979).

"To determine the voluntariness of a waiver, it is necessary to look at the totality of the circumstances, see Arizona v. Fulminante, 499 U.S. 279, 285 (1991), including 'the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his will easily to be overborne.'" Palmer, 203 F.3d at 60, quoting United States v. Rohrbach, 813 F.2d 142, 144 (8th Cir. 1987). "Though courts must presume that a defendant did not waive his rights, see Jackson, 918 F.2d at 241, the government may prove a waiver by a preponderance of the evidence." Palmer, 203 F.3d at 60; Connelly, 479 U.S. at 168.

Connelly and its progeny made clear that in order to find that a Miranda waiver was involuntary, the Court must conclude that the waiver was the product of police coercion. Connelly, 479 U.S. at 170 ("Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that."). "The voluntariness of a waiver of [the Fifth Amendment] privilege always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." Id.; Palmer, 203 F.3d at 62, quoting Connelly, 479 U.S. at 170. Thus, while a waiver must be "knowing" and "intelligent" as well as voluntary, the inquiry by the Court is not to determine whether a defendant's waiver was "totally rational and properly motivated." Connelly, 479 U.S. at 166. It is only that the defendant have, "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Colorado v. Spring, 479 U.S. 564, 573

18

(1987).  That inquiry is not a complex one:

> The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The Miranda warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The Miranda warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.
>
> . . . Once Miranda warnings are given, it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right--"his right to refuse to answer any question which might incriminate him."

Id. at 574-75 (citations omitted).  The Supreme Court has also noted that, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare."  Dickerson v. United States, 530 U.S. at 444, quoting Berkemer v. McCarty, 468 U.S. 420, 433 (1984).

Officers were extraordinarily solicitous of Muolo's constitutional rights in part because he was the son of a well-liked State Trooper.  Despite the fact that Muolo had twice provided false information to officers in the preceding days, and had taken an active role in hampering the investigation by tipping-off Minotti, officers not only provided him Miranda warnings, but repeatedly encouraged him not to waive his right to remain silent until it was determined whether his father could obtain counsel for him.  It was only through Muolo's insistence that officers took his statement, after obtaining a written Miranda waiver from him.  Thus, there is no evidence of the type of police coercion which is required to justify suppression of Muolo's statements.  See, e.g. United States. v. Trimble, 986 F.2d 394, 400 (10th Cir. 1993)(defendant

19

who pressed officers to talk to him about the case and then made statements to officers in return, was not coerced into making statements).

Moreover, the voluntariness of Muolo's waiver can be inferred from several facts. First, it was Muolo who pressed officers to take his statement. This alone is sufficient to support a finding of voluntariness. Id. Second, Muolo was not a stranger to law enforcement officers or to police procedures. See e.g. United States v. Jackson, 918 F.2d at 242 (1st Cir. 1990) (confession voluntary in part because of defendant's prior experience with judicial system). Muolo's father is a law enforcement officer and it can be inferred that he had been advising his son regarding his involvement in this case. In addition, Muolo had made statements to law enforcement officers on three prior occasions in the weeks before this event. Thus, speaking to law enforcement officers was neither foreign nor intimidating for him.[8] Third, when it came to the point where officers asked him to write his statement, Muolo had sufficient presence of mind to call his father and await the retention of counsel. Thus, Muolo exhibited an ability to invoke his rights when he believed it necessary, and officers complied with his request.

Even if one credits Muolo's claim that officers confronted him with inconsistencies in his statement, told him that he was a liar, and left him "in a huff," Defendant's Memorandum at 7, such conduct is not so coercive as to render his statement involuntary under Connolly. Nothing

---

[8] The fact that Muolo sought to manipulate his predicament by providing selective information to law enforcement officers is also indicative of the fact that his will was not overborne, and his statements were voluntary. In February 2004, he provided incriminating evidence about Minotti and Bucci to law enforcement officers while telling them nothing of his own involvement. On May 18, Muolo provided a version of events which limited his criminal culpability. On May 19, Muolo attempted to manipulate officers by feigning cooperation while having tipped-off Minotti. On May 20, Muolo again provided a statement which was not complete.

about the officers' exasperation with Muolo comes anywhere near threats of physical violence or other intentionally coercive conduct which shock the conscience or otherwise render a statement involuntary. See, e.g. Oregon v. Elstad, 470 U.S. 298, 309-317 (1985)(distinguishing between "physical violence or other deliberate means calculated to break the suspect's will" and non-coercive questioning).  Even if one assumes, *arguendo,* that officers in this case played "bad cop, good cop" with Muolo by expressing exasperation and then leaving him to speak with an officer of a more measured temperament, this is not so coercive as to render Muolo incapable of asserting his rights.  In fact, as outlined above, Muolo asserted those rights at the point he was asked to make a written statement.

### Conclusion

For the reasons set forth above, the government respectfully requests that the Court deny Defendant Muolo's motion to suppress his statements.

Respectfully Submitted,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

Date: June 10, 2005          By:    /s/ John T. McNeil
                                    JOHN  T.  McNEIL
                                    Assistant U.S. Attorney
                                    (617) 748-3242

21