UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA,

Action No. 1:04-cr-10194 RCL

v.

FRANCIS MUOLO, Anthony Bucci
and David Jordan,
Defendants.

DEFENDANT'S SENTENCING MEMORANDUM
IN SUPPORT OF DIMINISHED CAPCITY DEPARTURE

Preliminary

Defendant Francis A. Muolo offers this memorandum in aid of his May 30, 2006 sentencing and his motion for a diminished capacity departure based on a cognitive deficit from head trauma at age four. His February 2, 2006 plea agreement ("Plea Agreement") limits Mr. Muolo's sentence recommendation to not less than 48 months. The Plea Agreement limits the government's recommendation to not more than 60 months. The May 2, 2006 Pre-Sentence Report ("PSR") of USPO Sean Buckley recommends a range of 46 to 57 months.

Mr. Muolo seeks an order granting a downward departure from the sentence advised by the United States Sentencing Guidelines, pursuant to the 18 USC §3553(a) and the Fifth and Sixth Amendments to the U.S. Const. Mr. Muolo's childhood open head injury (crushing his forehead and right frontal lobe) left him with a cognitive deficit that significantly contributed to Francis Muolo's participation in criminal conduct. (See, Forensic Psychiatric Evaluation of Montgomery Brower, MD, dated February 6, 2006, Ex. A; Neuro-psychological

Evaluation of Dr. Charles Drebing, dated December 13, 2005, Exhibit B; both submitted February 12, 2006 under seal.) The injury left Francis with a diminished mental capacity that takes his conduct outside the heartland of like offenses.

Mr. Muolo's individual circumstances would support the exercise of this Court's discretion in granting a departure. At age 41, he has an extraordinarily low statistical and individual risk of reoffense and he has no criminal convictions. His extended family support and well-grounded socialization in his community indicate that he would easily avoid future criminal involvement.

Notwithstanding whether the Court grants a downward departure (and it would be warranted in doing so), the purposes of the Sentencing Reform Act as interpreted by *US v. Booker*, will be better served by mitigating Mr. Muolo's sentence (and granting a "variance" from the guidelines) on the grounds stated in this motion.

## FACTS

### A. General

The Court is well familiar with this case from the trial of the co-defendants in March and April. Francis Muolo reached a February 2, 2006 agreement ("Plea Agreement") with the government and the Court accepted his plea on February 13. The government convicted co-defendants Anthony Bucci and David Jordan after a 14-day trial beginning on March 20, 2006. The Court has ample evidence concerning the offense itself but fewer details concerning Mr. Muolo.

As the Court is aware, government witness Jon Minotti and co-defendant Anthony Bucci planned and later executed the robbery of three "cakes" (usually kilograms) of cocaine from Carlos Ruiz with the assistance of Malden Police Detective David Jordan and Francis Muolo. Government witness Jon Minotti recruited the then thirty-nine year-old Francis Muolo on December 23, 2003 to act as his driver so that he (Minotti) could take flight through the woods to a waiting car and make the staged police bust look real.

B. Relationship to Co-Defendant

Minotti and Mr. Muolo have a relationship that goes back into childhood. Though the relationship between Francis Muolo and Jon Minotti could be characterized as a friendship, it was primarily exploitive. Minotti has long shown Francis Muolo slight regard, even if this was not apparent to the latter. For instance, Mr. Minotti regularly referred to Francis as a "freak" in his conversations with Bucci, perhaps because of the scar on Francis' head or his mannerisms. In childhood, teen years and early adulthood, Mr. Muolo and Minotti were schoolmates and in baseball leagues together. After Mr. Muolo left service in the army for his rotator cuff injury, he worked as a plasterer for Minotti when living in Stoneham. Minotti subcontracted to Francis Muolo but regularly "shorted" Francis on his pay. (PSR ¶61.) Minotti supplied opioid narcotic drugs like Percodan to Mr. Muolo when he was working for Minotti's plastering company. (PSR ¶72; Brower report, p. 7.) The narcotic eased the pain of Mr. Muolo's rotator cuff injury when lifting and installing plasterboard. With

a growing drug dependency, it became easy for Minotti to exploit Francis Muolo's labor and short him on wages. ("The more pills he gave me, the harder I worked." Brower report, p. 7.)

Except for this prosecution, Mr. Muolo has no criminal record. His Massachusetts BoP reveals no arrests, charges or convictions. (PSR ¶¶38 - 44.) Mr. Muolo has admitted in his PSR interview, his evaluations and his safety valve proffer to a history of obtaining and using and marginal involvement with illegal drugs. (See, e.g., PSR ¶¶69 - 75; Brower report, p. 9.)

C. Social and Personal Factors

Francis Muolo lives in a circle of extended family. (Defendant attaches a sampling of the letters from Mr. Muolo's ex-wife, cousins, school principal, in laws and long-time friends.)

His most important relationship at present is with his 18 year-old son Taylor. (PSR ¶¶54 - 55.) Taylor is a star athlete and has received a full baseball scholarship to the University of Massachusetts. Many credit the father's dedication and patience over the seven years from 1996 to 2003 with Taylor's extraordinary success in sports. (PSR ¶54.) Mr. Muolo relates that he and his son share a "closer relationship than most father and son relationships". (PSR ¶55.)

Mr. Muolo has maintained a close relationship with Taylor's mother. The mother is often present in the family home in Stoneham. Mr. Muolo, his son's mother and defendant's parents, Frank and Anne Muolo, have worked together

in raising Taylor and providing a home for Taylor and, at times, Taylor's older half brother. Taylor's mother writes: "He [Francis Muolo] has been actively involved in Taylor's life and has contributed as a parent to his utmost ability…. He worked hard every day and paid his support for his son Taylor and contributed in every way he possibly could in Taylor's life." (May 22, 2006 letter attached, Ex. C.)

Mr. Muolo has a strong relationship with his girlfriend of several years and she is part of defendant's family. While she remains supportive and in a close relationship, Mr. Muolo was on electronic monitoring at the family home from June 22, 2004 to February 13, 2006. (PSR ¶¶58 - 59.) The girlfriend reiterates what the son's mother writes: "Except for working, all his time was spent with his son Taylor and sports…. When I first met Francis, my daughter was five years old. She is now 11 and loves cheerleading thanks to him. He is great with kids and helps them see how good sports really are…. Spending time with Francis and his family is what we love most." (Undated letter, attached, Ex. D.)

Mr. Muolo has strong ties to the community in Stoneham. Counsel attaches a letter from Mr. Muolo's high school vice principal who spent time with the young Francis Muolo after his brother Anthony Muolo's tragic death. (May 1, 2006 letter attached, Ex. E.) The vice principal has known Mr. Muolo over 25 years and attests to the father and now the son's participation in sports.

He has seen one generation interact with the other and remarks "[t]here is certainly a circle to our lives". *Id.*

With community ties come accountability. Mr. Muolo's uncle writes of the embarrassment defendant's conduct has caused his extended family. Defendant's father is a senior member of the Massachusetts State Police and the uncle is a 30-year Veteran of the Stoneham Police Department. (See Uncle's May, 2006 letter, Ex. F.) Francis Muolo's mother works for Stoneham Police Department.

D. Clinical Evaluations of Diminished Capacity

Mr. Muolo suffered a major head injury in childhood that left him with an impairment of his intellectual functioning. A car struck the young Francis at age four while crossing the street in front of his home in Stoneham. (PSR ¶65.) The accident smashed his right front forehead and left him with damage to the right frontal lobe. This is an area of the neuroanatomy connected with complex social decision making known as "executive function". As noted in the December 13, 2005 Neuropsychological Assessment:

> What injury or disorder could account for the noted results? One possible explanation is that these deficits reflect the residual effect of the head trauma Mr. Muolo suffered at the age of 4. We have very limited data about the injury, including whether he was unconscious and whether there was any immediate evidence of a decline in cognitive functioning. *The direct impact of the injury, as reflected in the obvious scar on Mr. Muolo's forehead, is over the right frontal portion of his brain. The pattern of deficits, including the impairment of visual spatial ability would be consistent with such a injury. Deficits in sustained concentration, as noted on cognitive testing and on the ADD Symptom Checklist, are also common sequellae of head injury, as are deficits in insight and social awareness. The naïve quality noted in the behavioral observations is not uncommon in adults with injury to frontal regions of the brain and often reflects a deficit in self awareness and processing of social cues.* (Exhibit A, p. 5.)

Dr. Brower's Forensic Psychiatric Evaluation elaborated on the diagnosis of right frontal lobe injury to rule out ADHD:

> Dr. Drebing noted that Mr. Muolo's history of right frontal head trauma, specific impairments in visual spatial ability and observed deficits in insight and social awareness tended to support head trauma as the primary cause of his impairments. Mr. Muolo's testing results were also 'consistent with a diagnosis of childhood ADHD, with at least some residual symptoms.' However, 'A diagnosis of ADD does not explain the noted deficit on testing of visual spatial ability and so may be a less satisfying explanation than that of 'head injury'. (Ex. B, p. 6.)

The brain injury makes Mr. Muolo socially naïve and susceptible to being misled; it reduces his ability to understand important social information and make appropriate choices based on such information.

> Right brain damage or dysfunction causes a person to have difficulty accurately perceiving and understanding emotional cues (for example, facial expression, tone of voice, body language), leading to impaired social judgment…. In my clinical opinion, reports of Mr. Muolo's mother and girlfriend that he has poor planning and organizational skills, is "naïve to people," misses the underlying meaning or social context in conversation, and fails to grasp the big picture and anticipate consequences, all largely reflect essentially life-long developmental deficits due to his childhood brain injury. (Dr. Brower Evaluation, Ex. B, pp. 8 - 9.)

Mr. Muolo's naïve behavior during the offense is apparent from multiple accounts of his first meeting Detective Jordan just before the robbery.

> Mr. Muolo's account of his conduct during the alleged incident is also strikingly naïve and socially unsophisticated given the circumstances. Mr. Muolo reported, for example, that upon learning one of the other defendants was a Malden police officer, he attempted to strike up a conversation with him about possible mutual acquaintances in law enforcement, including Mr. Muolo's own father. (Dr. Brower Evaluation, Ex. B, p. 10.)

The diagnosis for Mr. Muolo indicates that so long as he has no association with criminal elements and so long as he abstains from illegal drugs, he represents little risk of future criminality.

> Mr. Muolo's conduct, in my clinical opinion, was not motivated by antisocial personality traits or commitment to a criminal lifestyle. Rather, his actions were those of a cognitively limited and substance dependent man, who repeatedly sought status and acceptance as an adult through association with criminal peers. The data available to me indicate that the nature of Mr. Muolo's cognitive deficits and their impact on his ability to function socially and occupationally were never fully recognized or diagnosed prior to this evaluation. Because of his cognitive deficits due to head injury, in my clinical opinion, Mr. Muolo had significantly less ability than the average defendant to evaluate his conduct at the time of the alleged incident. Mr. Muolo reported that the Christmas holiday season leading up to the alleged incident had been stressful to him because of his failed attempt to run a business and the consequent break up of his longtime relationship with [his girlfriend]. Mr. Muolo appears to have allowed himself to be drawn into the alleged incident at a time when he was experiencing renewed humiliation over his repeated financial and social failures, which were significantly due to the long term consequences of his childhood head injury. (Brower evaluation, Ex. B, p. 10 - 11.)

E. Plea Agreement and Recommendations of the Parties

As set forth in defendant's May 19, 2006 "Motion for Downward Departure", the Plea Agreement governs their respective recommendations at sentencing. Muolo had pled guilty to counts I & II of the indictment (21 USC §§846 & 841(a)(1) respectively)(PSR ¶ 5). The May 2, 2006 PSR finds that while Mr. Muolo is subject to the five-year mandatory minimum of §841(a)(1)(PSR, p. 1), he is Safety-Valve eligible (PSR ¶32). The PSR credits two points for the Safety Valve, three points for Acceptance of Responsibility (PSR ¶¶ 23 & 37) and recommends a sentence of 46 to 57 months (PSR ¶ 93) on a Criminal History Category I (no convictions)(PSR ¶41). The plea agreement binds the government

to a recommendation of not more than 60 months and the defendant to not less than 48 months (plea agreement, p. 4; PSR ¶96). The parties have agreed that the total adjusted offense level is 25 (plea agreement p. 2). The PSR notes a total adjusted offense level of 23, based on a finding that Mr. Muolo is entitled to a minor role reduction, an adjustment not discussed in the plea agreement. The government takes the position that the defense is not free to agree with Probation's finding of a minor role adjustment.

ARGUMENT

> ***Hope is the necessary condition of mankind, for we are all created in the image of God. A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than that necessary to satisfy the goals of punishment.*** *U.S. v. Carvajal*, 2005 WL 476125 (S.D.N.Y. Feb. 22, 2005).

Francis Muolo moves for a departure and requests a variance from (or mitigation of) a Guidelines sentence within the range permitted by the plea agreement. Mr. Muolo moves for a departure based on his unique circumstances, diminished capacity or extraordinary mental condition that leaves him with an impaired intellectual executive function. See, USSG §§5K2.13 & 5H1.3.

POINT I:
THIS COURT HAS BROADER
SENTENCING AUTHORITY

A. Contours of the New Sentencing Law

The Court is familiar with the contours of the federal criminal sentencing law as it has evolved over the last seven years. *Jones v. United States*, 526 U.S. 227

(1999); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington*, 542 U.S. _, 124 S. Ct. 2531 (2004), *United States v. Booker*, 125 S. Ct. 738, 748-50 (2005). One Judge in this District made a succinct remark at a sentencing a week after *Booker*: "I think I have a little more flexibility now".[1] Described more in the terms of statutory interpretation, the remedial majority "modified" the SRA by "sever[ing] and excis[ing]" 18 U.S.C. § 3553(b)(1) – "the provision of the federal sentencing statute that makes the Guidelines mandatory," and 18 U.S.C. § 3742(e) – the appellate review section "which depends upon the Guidelines' mandatory nature," including in particular *de novo* review which made "Guidelines sentencing even more mandatory than it had been."[2] See 125 S. Ct. at 756-57, 764, 765. "So modified, the Federal Sentencing Act . . . makes the Guidelines effectively advisory. It requires a sentencing court to consider Guidelines ranges, see 18 U.S.C. §3553(a)(4), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a)." *Id.* at 757. Sentencing courts must now consider all of the goals and factors set forth in 18 U.S.C. § 3553(a), not just the guidelines and policy statements in the Guidelines Manual. See *Booker*, 125 S. Ct. at 757, 764, 766, 767, 768. See also*, e.g., United States v. Crosby*, 397 F.3d 103, 111-12 (2d Cir. Feb. 2, 2005).

---

[1] Hon. Richard G. Stearns, USDCJ, at January 28, 2005 sentencing of Robert Davis, 1:02-cr-10113-RGS.

[2] Counsel borrows freely in this subsection from an October 12, 2005 memorandum of Amy Baron-Evans, FDO Resource Counsel, entitled "Sentencing Post *Booker*".

The mandatory provisions of the SRA contained in §3553(b)(1) no longer apply; the new statutory directive is now one that limits the harshness of a defendant's sentence to one that is *no greater than necessary* to achieve the purposes of the SRA; the sentence must be "**sufficient, but not greater than necessary**," to fulfill "(2) the need for the sentence imposed –"

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant;
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2) (emphasis supplied).

This increased "flexibility" allows the Court to fashion a sentence for Mr. Muolo that is more appropriate to his cognitive deficit in the context of his personal and social history. While counsel believes that Mr. Muolo's diminished capacity and his good social history would qualify under *Koon* for a pre-*Booker* departure (see, *infra*), such an inquiry is needlessly mechanistic. Post-*Booker* cases illustrate that a court may consider formerly discouraged factors that would not have met pre-*Booker* standards for departure, to impose a lower sentence. See, *e.g., United States v. Spigner*, 416 F.3d 708, 711-13 & n.1 (8th Cir. 2005) (health problems); *United States v. Antonakopoulos*, 399 F.3d 68 (1st Cir. 2005)

(that defendant was caretaker for brain damaged son may be considered under 3553(a) though there were alternative means of care and thus not ground for departure).

One inarguable factor in the decision whether to grant Mr. Muolo's request for a departure or mitigation of sentence is his age. Now 41, he will be 45 or older upon release.[3] As to defendants over forty, the risk of recidivism drops dramatically, lessening the need to protect the public from further crimes of the defendant under 3553(a)(2)(C). See, *United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12 ("Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.), available www.ussc.gov/publicat/Recidivism_General.pdf

Thus, generally, though age and infirmity were discouraged bases for departure, they may now be considered regularly as part of the Court's analysis under 3553(a). *United States v. Lata*, __ F.3d __, 2005 WL 1491483 at *5 (1st Cir. June 24, 2005); *United States v. Thomas*, 360 F.Supp.2d 238, 243 (D. Mass. Mar. 14, 2005); *Simon v. United States*, 361 F.Supp.2d 35 (E.D.N.Y. Mar. 17, 2005).

---

[3] Mr. Muolo does not seek a departure based on age and the reduced likelihood of recidivism. Merely, the appropriateness of a departure or mitigation should be viewed in the statutory context. defendant's age may warrant a lower sentence if, because of his age, the resulting sentence is greater than necessary to reflect the seriousness of the offense. See, *United States v. Lewis*, 406 F.3d 11, 21-22 (1st Cir. 2005) (remanding for re-sentencing where district court expressed concern that the guideline sentence of 319 months amounted to a life sentence for a defendant who was 38 years old; finding under the circumstances, "we are satisfied that the district judge might well have given a different sentence if the advisory guideline regime had been in force."

POINT II:
DIMINISHED CAPACITY AND
EXTRAORDINARY MENTAL CONDITION
JUSTIFY DEPARTURE

A. Diminished Capacity

The expert reports offered at defense Exhibits A & B establish that Mr. Muolo suffers from a diminished mental capacity and that his conduct is connected with that mental defect. USSG §5K2.13 authorizes a departure if (1) the defendant committed the offense while suffering from "a significantly reduced mental capacity" and this reduced capacity "contributed substantially to the commission of the crime." However, the Court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71[obscenity], 109A[sexual abuse], 110[sexual abuse of children], or 117[transportation for illicit sexual activity], of title 18, United States Code. USSG §5K2.13.

Doubtless the government will argue that Mr. Muolo does not qualify for the departure because "(2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence". *Id.* Such an argument is misplaced. By the

government's own admission, the 18 USC §924(c) firearms charges do not apply to Mr. Muolo because Mr. Muolo did not supply, plan for, direct, possess or in any way control Detective Jordan's pistol. The question is more whether *the facts and circumstances of [this] defendant's offense indicate a need to protect the public….* USSG § 5K2.13. See, e.g., *United States v. Burhoe*, 409 F.3d 5 (1st Cir. 2005)(denying *Booker* sentencing remand on diminished capacity of PTSD/polysubstance abuse because court found actual violence in commission of offense of bank robbery with knife and stolen car). Based on all the evidence before the Court (including the many letters from family and community), there is no indication that Mr. Muolo is or has ever been violent.

This Circuit has long recognized diminished mental capacity as a ground for departure and mitigation of sentence.[4] While the First Circuit has often had occasion to uphold the denial of a 5K2.13 departure, there are exceptions. See, e.g., *US v. Lauzon*, 938 F.2d 326 (1st Cir. 1991)(affirming reluctant denial of downward departure to low IQ LSD user where expert found diminished capacity not related to commission of offense); United States v. Ez-Rodriguez, 92 F.3D 14 (1st Cir. 1996)(affirming denial of 5K2.13 departure because mental condition caused by substance abuse); *United States v. Maldonado-Montalvo*, 356 F.3d 65 (1st Cir. 2003) (based on pre-*Booker* standard, clinical depression not

[4] The principle that a diminished capacity reduces moral culpability is well recognized. See, *Tennard v. Dretke*, 124 S.Ct. 2562, 2571 (2004)("impaired intellectual functioning is inherently mitigating"); *Atkins v. Virginia*, 536 U.S. 304, 318 (2002) ("Mentally retarded persons... do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability."); Penry v. Lynaugh, 492 U.S. 302, 322 (1989) (O'Connor, J., concurring) ("mental retardation may render a defendant "less morally culpable than defendant who have no such excuse").

sufficiently extraordinary). It has allowed a District Court to apply the departure in bank robbery prosecutions, despite that granting such a departure is disfavored where the is a need to protect the general public. *United States v. Gorsuch*, 404 F.3d 543 (1st Cir. 2005)(schizophrenic female defendant) discussed *infra*; see, also, *United States v. Podolsky*, 158 F.3d 12 (1st Cir. 1998)(obsessive compulsive disorder).

*Gorsuch, supra,* is on point with the case at bar and indicates a departure for Mr. Muolo is warranted. In *Gorsuch,* defendant entered a bank in Bangor, Maine brandishing an unloaded semiautomatic handgun, robbed three teller stations of $8,304 and walked out the door. Within minutes, a police officer arrested a "dazed" Gorsuch near the bank and a grand jury indicted Gorsuch on one count of armed bank robberyand one count of brandishing a firearm in relation to a crime of violence. Gorsuch had been involuntarily admitted to a mental hospital with a diagnosis of paranoid schizophrenia and entered a plea of not guilty by reason of insanity. The case went to trial on the expert testimony of mental health professionals testifying to the nature and severity of defendant's illness. The jury rejected Gorsuch's insanity defense and convicted her on both robbery and brandishing counts. In remanding for consideration of resentencing under *Booker*, Justice Lynch wrote:

> On remand, the district court must consider the sentencing guidelines - but only on an advisory basis - and also must consider the other statutory factors set forth in 18 U.S.C. § 3553 (a), see Booker, 125 S.Ct. at 764-65, under which Gorsuch's serious mental illness, maternal responsibilities, and lack of a criminal record may be more relevant than under the pre-Booker regime of mandatory guidelines. On any further appeal, we will review the sentence imposed only for reasonableness. Id. at 765-66. *Gorsuch*, *supra.*

Though the First Circuit had noted that the departure was not often granted in circumstances of a bank robbery in the majority of Circuits, it views the district courts as having more authority to depart post-*Booker* and would review such a departure only in the context of the overall reasonableness of the sentence.

> Although we tentatively favor the former interpretation, we need not definitively resolve the question at this time because, in the post-Booker world, the sentencing guidelines are only advisory and the district court may justify a sentence below the guideline level based upon a broader appraisal. We therefore believe that the course of prudence is to vacate the sentence on count two and permit the district court to reconsider the matter under the Booker format. *Gorsuch, supra.*

Reviewing the Levine 108 Easy Mitigating Factors departure digest reveals that departures and sentence mitigations based on diminished capacity are common. Counsel notes but a few examples: *US v. Zedner*, 401 F.3d 36 (2nd Cir. 2005)(mental illness motivated financial crimes); *US v. Cantu*, 12 F.3d 1506, 1512, 1516 (9th Cir. 1993)(goal of the guideline [§ 5K2.13] is lenity toward defendants whose ability to make reasoned decisions is impaired -- where felon possessed firearm suffering post-traumatic stress disorder); *US v. Thompson*, 315 F.3d 1071 (9th Cir .2002) (district court to consider departure for diminished capacity because defendant could not control his addiction to pornography); —

*US v. Lewinson*, 988 F.2d 1005 (9th Cir. 1993) (affirmed 4-level downward departure under §5K2.13 drug use was both "a product and factor of his impaired mental condition"); *Caro v. Woodford*, 280 F.3d 1247, 1258 (9th Cir. 2002) (death penalty-vacated "more than any other singular factor, mental defects have been respected as a reason for leniency in our criminal justice system"); *United States v. Crockett,* 330 F.3d 706 (6th Cir. 2003) (income tax fraud case, diminished capacity downward departure from 21 months to probation affirmed because of defendant' depressive disorder); *US v. Sadolsky*, 234 F.3d 938 (6th Cir. 2000) (district court's two-level downward departure under §5K2.13 in computer fraud, based on defendant's compulsive gambling disorder, not an abuse of discretion); *Penry v. Lynaugh*, 492 U.S. 302, 322 (1989) (O'Connor, J., concurring) (mental retardation rendering a defendant "less morally culpable than defendant who have no such excuse"). *U.S. v. Davis*, 919 F.2d 1181, 1187 (6th Cir. 1990) (downward departure justifiable defendant commiting nonviolent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of intoxicants); *U.S. v. Ruklick,* 919 F.2d 95, 97, 99 (8th Cir. 1990) (downward departure when defendant suffering from longstanding schizophrenic affective disorder); *U.S. v. Weddle,* 30 F.3d 532, 540 (4th Cir. 1994) (downward departure for defendant suffering from Hodgkin's disease upheld in conviction for mailing threatening letters in violation of 18 U.S.C. §876);*U.S. v. Adonis*, 744 F.Supp. 336 (D.D.C. 1990) (downward departure where defendant's IQ of 64 showing him retarded where average IQ of prison population at 93).

B. Combination Departure

The Plea Agreement allows Mr. Muolo "the right to argue that he is entitled to a downward departure or a mitigation of his sentence based on his mental status or condition connected to a childhood head injury, particularly, a right frontal lobe injury". (Plea Agreement, p. 2.) Pursuant to U.S.S.G. § 5K2.0, it is permissible to base a downward departure on a combination of factors, none of which would suffice when considered individually, if those factors are present to an exceptional degree. *Koon v. U.S.,* 518 U.S. 81 (1996)(seminal case in which Justice Kennedy upheld departure for officer convicted of violating civil rights in beating of Rodney King). *See* § 5K2.0 *Commentary* ("The Commission does not foreclose the possibility of an extraordinary case that, because of a combination of such characteristics or circumstances, differs significantly from the heartland cases…even though none of the characteristics or circumstances individually distinguishes the case."); *see also United States v. Bogdan*, 284 F.3d 324, 328-330 (1st Cir. 2002); *see also United States v. Sklar*, 920 F.2d 107, 117 (1st Cir. 1990) (factors inadequate to warrant departure when taken in isolation may in combination suffice to remove a case from the heartland). This practice is common to other Circuits as well as this one. See, *e.g.*, *United States v. Rioux*, 97 F.3d 648, 663 (2nd Cir. 1996), (affirming a downward departure based on a combination of the defendant's physical condition and charitable work even though such factors are not ordinarily relevant in determining whether the defendant should receive a downward departure); a*ccord, United States v. Broderson*, 67 F.3d 452, 458-59 (2d

Cir. 1995) (departure where "confluence of circumstances was not taken into account by the guidelines); *United States v. Bowser*, 941 F.2d 1019, 1024-25 (10th Cir. 1991) ("unique combination of factors" warranted departure).

C. Age and Recidivism

Mr. Muolo's age, though not an independent basis for departure, is a relevant consideration in whether there is a future risk to the public under §5K2.13. Age, more than any other general factor, is the strongest indicator of recidivism and the need for a longer or shorter sentence to protect the public. While age and infirmity were discouraged bases for departure, they should be considered under 3553(a) as one of the overarching factors in fashioning a sentence. *United States v. Lata*, __ F.3d __, 2005 WL 1491483 at *5 (1st Cir. June 24, 2005); *United States v. Thomas*, 360 F.Supp.2d 238, 243 (D. Mass. Mar. 14, 2005). Physical condition, which may be related to age, is addressed at § 5H1.4. As to defendants over forty, the risk of recidivism drops dramatically, lessening the need to protect the public from further crimes of the defendant under 3553(a)(2)(C). See *United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12 ("Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.), available at http://www.ussc.gov/publicat/Recidivism_General.pdf. See *Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines,* at pp. 12 & 28 (2004)("Recidivism rates decline relatively consistently as age

increases," from 35.5% under age 21, to 9.5% over age 50.), available at http://ww w.ussc.gov/publicat/Recidivism-General.pdf.)

NON-DEPARTURE MITIGATON
CONSIDERATIONS WITHIN GSR

The Court may wish to consider the impact of this sentence on the Muolo family. The Muolos have suffered first the defendant's accident at age four and then the accidental shooting death of defendant's brother approximately five years later. Their surviving son's criminal involvement has been the source of embarrassment and has affected all the Muolos and the Cullens. (See Exs. E & F.)

JUDICIAL RECOMMENDATION

Defendant requests a judicial Recommendation to the US Bureau of Prison's 500 Hour Comprehensive Drug Treatment Program. The PSR contains ample support for such a recommendation. (See, PSR ¶¶69 - 75.) Mr. Muolo requests that he serve the Drug Treatment portion of his sentence in a facility in the Northeast Region at Fort Dix. For the remainder of his sentence, he requests designation to the FMC Devens camp or similar facility in the Northeast region if Devens is unavailable.

CONCLUSION

For the reasons set forth above, defendant's should be granted.

Dated this 24th day of May, 2006 at Boston, Massachusetts.

/s./ Kevin L. Barron
Kevin Lawrence Barron 550712
Attorney for Francis A. Muolo

CERTIFICATE OF SERVICE

Counsel certifies he has served AUSA John McNeil with a true copy of this motion today be transmitting the same to him through this District's CM/ECF. Counsel certifies further that no party requires service by other means.

/s./ Kevin L. Barron

Kevin Lawrence Barron 550712
Attorney for Francis Muolo
453 Washington St. - 5th Floor
Boston, MA 02111-1325
Tel. No. 617.482.6368
kevin.barron@mac.com